UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

RECOVERY LIMITED PARTNERSHIP,

       Plaintiff,

    v.                        CIVIL ACTION NO: 2:87cv363

THE WRECKED AND ABANDONED VESSEL,
S.S. CENTRAL AMERICA, ET AL.,

       Defendants.

## OPINION

This matter comes before the court on the Motion for Salvage Award ("Motion") and accompanying Memorandum in Support, filed by the Plaintiff, Recovery Limited Partnership ("RLP"), on January 29, 2016. ECF Nos. 206, 207.

### I. PROCEDURAL HISTORY

This in rem action, involving the wreck of the S.S. Central America ("Central America"), was commenced in 1987 by RLP's agent, Columbus-America Discovery Group, Inc. ("CADG"). The numerous prior opinions and orders in this case thoroughly review the relevant factual and procedural history, and that history will not be repeated in detail here.

The Central America was traveling from Aspinwall, Colombia, to New York City, with a stop in Havana, Cuba, when it sank in 1857. It left Havana on September 8, 1857, carrying approximately 580 people and commercial gold worth over $1.2 million (1857

value), along with an unknown quantity of personal passenger gold. The vessel sank off the coast of South Carolina on September 12, 1857, taking with it approximately 425 people, the personal and commercial gold, and hundreds of bags of mail. Initial efforts to locate the shipwreck and salvage the gold were unsuccessful.

CADG filed this action in 1987, after locating what it believed was the Central America. That wreck turned out to be the wrong ship, but two years later, CADG discovered the actual Central America, approximately 160 miles off the coast of Charleston, South Carolina. CADG was then awarded the status of first salvor, entitled to salvage the Central America without interference, by the court's Order of August 18, 1989.

Several insurance companies filed claims to the recovered gold, alleging they had insured the commercial gold shipments and paid for the losses. On August 14, 1990, the court found that the insurance companies had abandoned any right or claim to the gold, and CADG was entitled to and vested with the sole ownership of the gold. Columbus-Am. Discovery Grp. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 742 F. Supp. 1327, 1344-48 (E.D. Va. 1990) ("CADG I"). On appeal, the Court of Appeals for the Fourth Circuit held that the district court erred in applying the law of finds, rather than the law of salvage, to the gold recovered from

the wreck. Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co., 974 F.2d 450, 468 (4th Cir. 1992) ("CADG II").

On remand, the court found that CADG was entitled to a salvage award of ninety percent (90%) of the recovered gold, and directed the parties to develop a marketing plan for the gold. Columbus-Am. Discovery Grp. v. Unidentified, Wrecked & Abandoned Sailing Vessel, No. 87-363-N, 1993 WL 580900, at *32-33 (E.D. Va. Nov. 18, 1993) ("CADG III"). The Fourth Circuit affirmed this decision, but instructed the district court, on remand, to decide whether the insurance underwriters as a whole were entitled to the remaining ten percent (10%), and whether each insurance underwriter actually owned the gold it claimed. Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co., 56 F.3d 556, 562, 576 (4th Cir. 1995) ("CADG IV"). CADG and the insurance underwriters eventually agreed to a settlement, which divided the gold in specie and dismissed all claims of the parties, including "the possibility of claims between the parties over future salvage." Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co., 203 F.3d 291, 297, 300 (4th Cir. 2000) ("CADG V").

There were then only infrequent filings in this case, until RLP moved to be substituted as the real-party-in-interest for CADG on January 3, 2014. ECF No. 1.[1] On April 17, 2014, RLP filed

_____

[1] This motion was filed by RLP through its court-appointed Receiver, Ira Owen Kane. See ECF No. 1. RLP was placed under the

an in rem complaint against the Central America, which opened a new civil action, Case No. 2:14cv160.[2] ECF No. 1 ("2014 Case"). The court ordered a warrant for the arrest of portions of and artifacts from the ship, and directed RLP to publish notice of the action and arrest of the Central America for four successive weeks. Order to Issue Warrant of Maritime Arrest at 1-2, ECF No. 4 (2014 Case). RLP complied with the court's Order, and four parties filed timely claims, asserting a right and interest in the Central America: (1) CADG, ECF No. 16 (2014 Case); (2) Richard T. Robol and the Robol Law Office ("Robol"), ECF No. 76 (2014 Case); (3) Collette Davidson ("Davidson"), ECF No. 84 (2014 Case); and (4) Milton T. Butterworth Jr. ("Butterworth"), ECF No. 85 (2014 Case).

On July 9, 2014, the court granted RLP's Motion to Substitute Party, and named RLP as the salvor-in-possession of the Central America. Mem. Op. & Order at 26, ECF No. 92. Accordingly, the court denied CADG's claim to the Central America. Mem. Order at 7, ECF No. 94 (ECF No. 95 (2014 Case)). The court also reopened Case No. 2:87cv363, and consolidated Case

---

supervision of the Receiver by the Court of Common Pleas of Franklin County, Ohio, and charged with making "every effort to . . . conduct such maritime operations that are designed to make a positive financial return" for RLP. See Mem. Op. & Order of July 9, 2014, at 4-5, ECF No. 92.

[2] Filings in the 2014 Case, Case No. 2:14cv160, are noted as such. All other docket entries are in Case No. 2:87cv363.

4

No. 2:14cv160 with Case No. 2:87cv363. Mem. Order at 6, ECF No. 94 (ECF No. 95 (2014 Case)). Further, on August 8, 2014, the court dismissed, for failure to state a claim under salvage law, the claims of Robol, Davidson, and Butterworth. Mem. Order at 1-2, ECF No. 114. Robol, Davidson, and Butterworth each filed a notice of appeal, and the Fourth Circuit affirmed the district court's judgment on each claim. See ECF Nos. 173, 181, 187. Therefore, RLP was left as the only party asserting an interest in the Central America.

On September 5, 2014, RLP filed a Motion for Award of Title. ECF No. 139. Robol, whose claim the court dismissed in the Memorandum Order of August 8, 2014, filed a Response, opposing RLP's motion because "it does not acknowledge [Robol's] right to a salvage award." Resp. at 1, ECF No. 143.[3] RLP filed its Reply on September 15, 2014. ECF No. 156. The Motion for Award of Title became ripe on July 31, 2015, after the Fourth Circuit decided the appeals of this court's dismissal of the third-party claims brought by Robol, Davidson, and Butterworth. See ECF No. 191 (Fourth Circuit Mandate on last pending appeal). By Opinion of August 11, 2015, the court denied the Motion for Award of Title, finding that the admiralty law of salvage, not the common law of finds, applies to the Central America wreck.

---

[3] Robol's Response was filed while his appeal of the court's dismissal of his third-party claim was pending in the Fourth Circuit.

Op. at 17, ECF No. 192. The court advised RLP that it could move for a salvage award under maritime law, and detailed the factors to be considered for a salvage award. Id. at 16-17.

On January 29, 2016, RLP filed the instant Motion and Memorandum in Support. RLP requests a salvage award of not less than one hundred percent (100%) of the value of the salvaged items recovered in 2014, to be made in specie by conveying title to the salvaged items, and prejudgment interest on RLP's expenses in planning and conducting the salvage. Mem. Supp. at 3-4. No responses to the Motion were filed.

The court held a three-day evidentiary hearing on the Motion, and directed that RLP file any supplemental brief by July 25, 2016. RLP filed its Supplemental Memorandum in Support on July 25, 2016. ECF No. 228. It attached Proposed Findings of Fact and Conclusions of Law ("Proposed Findings"). ECF No. 228-1. This matter is ripe for decision.

## II. ADMIRALTY LAW OF SALVAGE

### A. Determination of Salvage Award

A salvage award is "a reward given for perilous services, voluntarily rendered, and as an inducement to seamen and others to embark in such undertakings to save life and property." The Blackwall, 77 U.S. (10 Wall) 1, 14 (1869). To encourage salvage operations, a salvor is entitled to "liberal compensation." Id. Rather than obtaining title to the salvaged property, a salvor

acts on behalf of the property's owner, thereby obtaining a lien against the property saved. The "Sabine", 101 U.S. 384, 386 (1879). The salvor's lien is exclusive and prior to all others, and grants the salvor a possessory interest in the res, pending satisfaction of the lien. R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943, 963 (4th Cir. 1999). A salvor may enforce its lien on the salved property by pursuing an in rem action. Id.

The salvor must establish three elements to prove entitlement to a salvage award: (1) that the salved property faced a marine peril; (2) that the salvor's services were voluntarily rendered without an existing contractual duty; and (3) that the salvage efforts were successful, in whole or in part. The "Sabine", 101 U.S. at 384.

Once the court has determined that a salvor is entitled to a salvage award, there are seven factors to consider in determining the amount of the award. The first six factors have been described by the Supreme Court as the "main ingredients" in determining the amount of an award for salvage. The Blackwall, 77 U.S. (10 Wall) at 13-14. These six factors are: (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk

7

incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. Id. at 14. In this case, the Fourth Circuit added a seventh factor: the degree to which the salvors have worked to protect the historical and archaeological value of the wreck and the items salved. CADG II, 974 F.2d at 468.

When calculating a salvage award, the court of admiralty becomes a court of equity, and the award may "be increased, diminished, or wholly forfeited, according to the merit or demerit of the salvor." Id. (quoting W. Marvin, A Treatise on the Law of Wreck and Salvage § 218, at 226 (1858)). The amount of the award is "primarily a matter of judgment to be exercised" by the court. CADG IV, 56 F.3d at 569 (quoting Waterman S.S. Corp. v. Dean, 171 F.2d 408, 411 (4th Cir. 1948)). However, an award typically cannot exceed the market value of the property; even if it does, the judgment is limited to the value of the property because the action is against the property itself. R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 286 F.3d 194, 204 (4th Cir. 2002); Allseas Maritime, S.A. v. M/V Mimosa, 812 F.2d 243, 246 (5th Cir. 1987).

## B. Grant of Award in Specie

If no owner comes forward to claim the recovered property, "the salvor is normally awarded its total value." CADG II, 974

F.2d at 459. In such a case, after determining the salvage award, the court may sell the property and pay the salvor from the proceeds. R.M.S. Titanic, Inc., 286 F.3d at 203-04. If the sale yields too little to satisfy the salvor's lien, the judgment is limited to the value of the property. Id. at 204. However, if the court determines that "the proceeds of any sale would clearly be inadequate to pay the salvor its full reward," the court may, as a matter of discretion, award title to the property instead. Id.; see also Cobb Coin Co. v. Unidentified, Wrecked & Abandoned Sailing Vessel, 525 F. Supp. 186, 198 (S.D. Fla. 1981) (stating that the salvaged items are normally sold to satisfy the judgment, but if the "'proceeds' of the salvor's find are items uniquely and intrinsically valuable beyond their monetary worth, an award in specie is more appropriate"). An award of title should be granted, only if the sale of the property would prove insufficient to fairly compensate the salvor. Haver, 171 F.3d at 966. In sum, the court must first determine the amount of any salvage award, and then determine how it should be paid. See R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel, 742 F. Supp. 2d 784, 795 (E.D. Va. 2010).

## C. Prejudgment Interest

The awarding of prejudgment interest in maritime law "is the rule rather than the exception." U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828 (4th Cir. 1992).

Typically, prejudgment interest serves "as compensation for the use of funds to which the claimant was rightfully entitled." Noritake Co., Inc. v. M/V Hellenic Champion, 627 F.2d 724, 728 (5th Cir. Unit A 1980). The prejudgment interest generally accrues from the date of the loss, or the time at which the salvor became entitled to a salvage award. Platoro Ltd., Inc. v. Unidentified Remains of a Vessel, Her Cargo, Apparel, Tackle, & Furniture, in a Cause of Salvage, Civil & Mar., 695 F.2d 893, 906-07 (5th Cir. 1983). However, a district court may decline to award prejudgment interest, when "peculiar circumstances" would render such an award inequitable. Orduna S.A. v. Zen-Noh Grain Corp., 913 F.2d 1149, 1157 (5th Cir. 1990).

### III. ANALYSIS

#### A. Factors in Salvage Award Calculation

There is no doubt that RLP has established the three threshold requirements for a salvage award: a marine peril, voluntary rendering of the salvor's services, and success of the salvage efforts. The Central America lies 7,200 feet below the surface, placing it and its cargo in maritime peril. See CADG IV, 56 F.3d at 572-73. RLP's salvage efforts were voluntary, in that it owed no contractual duty to perform the salvage. Lastly, RLP's efforts have been successful in recovering approximately 16,000 artifacts from the wreck site in an archaeologically

10

sensitive manner.[4] Thus, having determined that a salvage award is appropriate, the court must now determine the amount of that award. The seven Blackwall/Columbus-America factors are discussed in turn.

### 1. Labor Expended by the Salvors

RLP contracted with Odyssey Marine Exploration ("Odyssey") to perform the at-sea recovery operations, using Odyssey's research vessel, the Odyssey Explorer, and its remotely operated vehicle ("ROV"), Zeus. Together, the professionals at RLP and Odyssey spent an impressive amount of time, money, and energy in the 2014 salvage efforts, as detailed below. The labor expended has been thorough and commendable at every stage, from the initial planning of the operations through post-salvage storage and conservation.

During recovery operations, the Odyssey Explorer carried seventeen ship crew members, and a technical crew of up to eighteen individuals. RLP Evid. Hr'g Ex. 1A (Deposition of Andrew Craig).[5] The crew worked two, twelve-hour shifts to

---

[4] These items are listed in the inventories filed with the court. See ECF Nos. 129-2 to 129-7, 158-7; ECF Nos. 72, 73 (2014 Case). The inventories were also introduced and admitted as Exhibit 12 at the 2016 RLP Evidentiary Hearing. See infra note 5.

[5] As previously indicated, the court held an evidentiary hearing on the Motion for Salvage Award on June 29-30, 2016, and July 1, 2016. The RLP evidentiary hearing exhibits referred to herein were all admitted into evidence over the course of that

maintain twenty-four-hour ship operations. Id.; RLP Evid. Hr'g Ex. 47 at 7. The shifts often lasted longer; for example, crew members worked extra hours as needed to finish processing artifacts and complete daily reporting. RLP Evid. Hr'g Ex. 47 at 7.

Before starting any recovery work, the team created a photomosaic of the entire wreck site, composed of approximately 12,500 individual high-resolution images spliced together to create one detailed image. Second Report on Activities at S.S. Central America Shipwreck Site at 1, ECF No. 90 (2014 Case) (RLP Evid. Hr'g Ex. 7). Pre-disturbance work also included a multibeam sonar survey of the site, producing images of the topography of the wreck site and surrounding seafloor. Id. After the site surveys, the crew commenced the exacting work of clearing sediment and coal from the ship's keel and collecting artifacts, coins, and ingots, one-by-one. Over the course of 129 days at the wreck site, the crew performed eighty-three dives, for a total of 2,093 hours of dive time. RLP Evid. Hr'g Ex. 47 at 36. The longest dive lasted over 129 hours. Fifth Report on Activities at S.S. Central America Shipwreck Site at 1, ECF No. 163-1 (RLP Evid. Hr'g Ex. 10). During these dives, the crew excavated 2,614 square meters of the wreck site, moving 1,307

_____

hearing. Likewise, the testimony cited herein is from the evidentiary hearing.

cubic meters of sediment to reach additional items of treasure. RLP Evid. Hr'g Ex. 47 at 36.

RLP spent approximately $7.6 million in direct expenses on the 2014 at-sea recovery operations and post-recovery storage and conservation of the salvaged items. RLP Evid. Hr'g Exs. 24-33.[6] The court recognizes the magnitude of resources and manpower devoted to the salvage of the Central America since 2014. In determining the amount of an appropriate salvage award, the labor expended by RLP weighs greatly in its favor.

### 2. The Promptitude, Skill, and Energy Displayed in Rendering the Service and Saving the Property

Recovering treasure located over a mile below the surface of the Atlantic Ocean, and covered with 150 years of accumulated sediment, unquestionably requires great skill. As with its initial recovery operations beginning in the late 1980s, RLP has again assembled a highly experienced team to perform the 2014 recovery operations. It gathered experts in marine archaeology, marine salvage, geology, engineering, conservation, and numismatics, among other disciplines. A key step in assembling these professionals was RLP's thorough selection process to find a partner to perform the at-sea operations. See RLP Evid. Hr'g

---

[6] On July 14, 2016, RLP submitted amended Exhibits 24 and 27, to correct an error in the invoices submitted by Sconset Marine. ECF Nos. 225, 225-3 (Exhibit 24), 225-4 (Exhibit 27, part 1), 225-5 (Exhibit 27, part 2). The $7.6 million total cited above is the updated total, as provided in amended Exhibit 24. ECF No. 225-3.

Ex. 47 at 2-4. It ultimately selected Odyssey as the company best able to perform the required work, given Odyssey's deep-sea archaeology experience and technological capabilities.[7]

Odyssey brought experienced personnel and sophisticated equipment to the salvage efforts. The Zeus ROV is specially designed for deep-sea archaeological survey and recovery operations, with advanced positioning technology, photographic and video equipment, and deep-sea excavation and artifact recovery tools. First Report on Activities at S.S. Central America Shipwreck Site at 1, ECF No. 21-1 (2014 Case) (RLP Evid. Hr'g Ex. 6). These recovery tools include two manipulator arms, a limpet suction device that attaches to a manipulator arm, and the proprietary Sediment Removal and Filtration System. See id. at 1-2; RLP Evid. Hr'g Ex. 3. Operating the ROV to excavate portions of the wreck site and collect gold and cultural heritage items in an archaeologically-sensitive manner required great skill and dedication by the crew.

When these existing tools were not sufficient to collect specific items or remove obstacles, the crew designed and constructed new tools, using the onboard mechanical/welding shop. See Third Report on Activities at S.S. Central America

---

[7] In fact, Michael Anderson, who the court qualified as an expert in salvage operations, opined that RLP could not have selected a better company for the Central America operations. Testimony of Michael Anderson at RLP Evid. Hr'g (June 30, 2016).

Shipwreck Site at 1-3, ECF No. 110-1 (RLP Evid. Hr'g Ex. 8); RLP Evid. Hr'g Ex. 4 at 9. For example, the crew fabricated a spatula-type tool to collect a sextant without damaging it, and experimented with various tools, constructed while at sea, to find the most effective way to move concreted coal from the keel. Suppl. Mem. Supp. at 6; RLP Evid. Hr'g Ex. 47 at 20-21.

Once brought onboard the Odyssey Explorer by the ROV, the artifacts underwent an extensive cataloguing and preservation process, determined by the artifact's material composition.[8] Coins, gold ingots, jewelry, and other precious metal items were taken to a "Coin Room," and cultural heritage artifacts were taken to the archaeological van, or "ARC Van," for secure storage and conservation, until they could be transported to a land-based laboratory. See First Report on Activities at S.S. Central America Shipwreck Site at 3-4, 11 (RLP Evid. Hr'g Ex. 6); Fourth Report on Activities at S.S. Central America Shipwreck Site at 3, ECF No. 130-1 (RLP Evid. Hr'g Ex. 9). Both areas, the Coin Room and the ARC Van, provided tools for additional documentation, initial conservation work, and short-term storage. First Report on Activities at S.S. Central

---

[8] The record of the artifact's provenance begins when the artifact is located on the ocean floor, as the ROV transmits its position and activities, and personnel can record their observations, to create a detailed log of each dive. First Report on Activities at S.S. Central America Shipwreck Site at 3, ECF No. 21-1 (2014 Case) (RLP Evid. Hr'g Ex. 6). The dives were also photographed and filmed. Id.

America Shipwreck Site at 3-4 (RLP Evid. Hr'g Ex. 6). Each item was individually evaluated to determine the necessary procedure to document and preserve the artifact while on board the ship, a task requiring substantial knowledge and outlay of time by the archaeologists and conservator. See id. at 4.

RLP contracted with Numismatic Conservation Services, LLC ("NCS") to store and preserve the items once they were brought ashore. NCS was appointed by this court to be the substitute custodian at the recommendation of RLP, which exercised care in selecting and recommending a substitute custodian with suitable experience, facilities, and capabilities. See Order of June 12, 2014, ECF No. 61 (2014 Case). NCS, under the supervision of RLP, continues to store and preserve the recovered items in accordance with the conservation requirements of this court and the recommendations of appropriate specialists. Proposed Findings at 17 & n.1.

Although almost 16,000 items were recovered, RLP and its witnesses warrant that no items were damaged during the recovery operations. Proposed Findings at 7-8 (citing Testimony of Andrew Craig, Neil Dobson, and Craig Mullen); RLP Evid. Hr'g Ex. 44 at 3 (noting that no coins or ingots had been damaged). This is a notable achievement, considering the challenges in collecting the items from the seabed using the ROV, bringing them to the surface, processing them aboard a ship at sea, and transporting

them to more permanent storage facilities once on land. The court recognizes the care and expertise required at all stages of saving the property, as well as RLP's continued commitment to preserving the recovered items.

Considering the immense level of difficulty in retrieving and preserving the artifacts, the court finds that RLP has shown a high level of skill and energy in its salvage operations. This factor thus weighs in RLP's favor in determining the amount of the salvage award.

### 3. The Value of the Property Employed by the Salvors, and the Danger to Which Such Property Was Exposed

As noted above, RLP contracted with Odyssey to conduct the at-sea salvage operations. Odyssey had state-of-the-art equipment capable of successfully performing the desired recovery operations.[9] The Odyssey Explorer had an insured value of $1.5 million at the time of the expeditions, and Zeus, with its attendant equipment, had an insured value of $6.5 million. RLP Evid. Hr'g Ex. 1A (Deposition of Andrew Craig); Suppl. Mem. Supp. at 4. The court accepts these values as representative of the specialized equipment necessary to perform these salvage operations. Further, the Odyssey Explorer faced the dangers inherent to extended time at sea, including two hurricanes that

---

[9] While the Odyssey Explorer was originally built as a factory trawler, it underwent a rebuild in 1994 to specially equip it for deep sea exploration and recovery expeditions. RLP Evid. Hr'g Ex. 2.

17

passed over the wreck site, and Zeus, in performing over eighty dives, was repeatedly imperiled by the high pressure, cold temperatures, and floor currents present over a mile below the surface. See RLP Evid. Hr'g Ex. 47 at 9.[10]

However, because RLP did not own the equipment used during the salvage operations, this factor is less important than the others. See R.M.S. Titanic, Inc., 742 F. Supp. 2d at 799.[11] The information does exhibit the technological challenges of salvaging the wreck site, and, to that extent, it weighs in RLP's favor.

### 4. The Risk Incurred by the Salvors in Securing the Property from the Impending Peril

This factor examines the risk to the salvors' personal safety and the risk to their property. See The Blackwall, 77 U.S. (10 Wall) at 14. It carries more importance when a "distressed vessel's immediate peril likewise imperiled its attempted savior." CADG IV, 56 F.3d at 572. However, in its Opinion affirming a previous salvage award in this case, the Fourth Circuit recognized the risks incurred during salvage operations of the Central America, given the distance from shore, use of heavy equipment, and number of days spent at sea.

---

[10] The risk to which the salvor's property was exposed is discussed further under the next factor.

[11] The cost to RLP of renting this equipment is subsumed within Blackwall Factor 1.

Id. Those same risks were incurred during the 2014 recovery operations, although the 2014 operations lasted for fewer days than the efforts addressed in 1995 by the Fourth Circuit in CADG IV. Nevertheless, the 2014 crew spent a significant amount of time at sea, most of it 160 miles from shore. Of note, obtaining medical treatment for any severe injuries that might occur would take hours. See id. (noting the risk of dealing with heavy equipment when the distance from shore meant medical treatment was hours away).[12]

As discussed above, RLP did not own the equipment used in the salvage efforts. While its risk of property damage therefore appears to have been limited, the two RLP employees participating in the operations, Craig Mullen and Robert Evans, faced personal risk during their time at sea.[13] Accordingly, this factor weighs in RLP's favor, but it is accorded limited weight.

---

[12] One crewmember did suffer an injury to his arm, and a resulting infection, that required an airlift delivery of antibiotics to the Odyssey Explorer. See RLP Evid. Hr'g Ex. 1A (Deposition of Andrew Craig); Testimony of Craig Mullen at RLP Evid. Hr'g (June 29, 2016).

[13] There is no evidence before the court that RLP assumed liability for damage to Odyssey property or personal injury incurred by Odyssey employees during recovery operations. Thus, only risks to the personal safety of the RLP personnel aboard the Odyssey Explorer bear particular weight in assessing this factor. See R.M.S. Titanic, Inc., 742 F. Supp. 2d at 800.

### 5. The Value of the Property Saved

Currently before the court is the property recovered during the 2014 at-sea operations, which can be separated into two types. First, RLP recovered various items of cultural heritage, photographs and photographic memorabilia, jewelry, and paper documents (collectively, the "artifacts"). Second, RLP collected gold dust and mineral form gold, gold ingots, gold coins, and other coins of silver and copper (collectively, the "gold"). When performing its analysis under The Blackwall factors, the court need only determine "a rough approximation of the worth of the salved property." Rand v. Lockwood, 16 F.2d 757, 759-60 (4th Cir. 1927). RLP submitted valuation reports and accompanying testimony by two experts: Richard-Raymond Alasko, who valued the artifacts at $1,034,625, RLP Evid. Hr'g Ex. 35 at 2, and Dwight Manley, who valued the gold at $47,180,800. RLP Evid. Hr'g Ex. 44 at 20. The total estimated value of all the property recovered is then $48,215,425. If the court grants a salvage award, the ceiling for such an award is the fair market value of the artifacts and gold. See R.M.S. Titanic, Inc., 286 F.3d at 204; Allseas Maritime, S.A., 812 F.2d at 246.

Mr. Alasko, who valued the artifacts at a total of $1,034,625, used a sales comparison approach to determine the fair market value of each of the 588 recovered artifacts. RLP Evid. Hr'g Ex. 35 at 2-3. The valuation assumes that the

artifacts will be sold individually, rather than as a lot, through public sale. Id. at 5. It further assumes the artifact sales will target the appropriate markets for historic maritime and cultural properties. Id. at 5, 136. Mr. Alasko, working with consultant experts for the four categories of artifacts — cultural heritage items, photographs and photographic memorabilia, jewelry, and paper documents — first examined each artifact at the storage facility. Id. at 6. From this examination, Mr. Alasko and his team of consultant experts[14] identified appropriate comparison sales from a database of cultural artifact sales, based on relevant factors such as the provenance, condition, and character of each artifact. See id. at 3, 5.[15] To arrive at a final individual valuation for each artifact, the comparable sales were adjusted for discernible differences in the items. Id. at 3, 6.

Mr. Manley valued the gold at a total of $47,180,800. RLP Evid. Hr'g Ex. 44 at 20. Of the approximately 15,000 gold items

---

[14] These consultant experts were Jacob Fish (cultural heritage items), Brooks Rice (cultural heritage items), Kathleen Lamb (photographs and photographic memorabilia), William Milne (jewelry), and Fred Holabird (paper documents). RLP Evid. Hr'g Ex. 35 at 9, 57, 62, 89.

[15] The comparable sales database was compiled from a survey of the market for cultural properties, in general, and cultural properties retrieved from notable shipwreck sites, in particular. RLP Evid. Hr'g Ex. 35 at 6, 136-39. The appraisers also surveyed sales results for historic artifacts from the California Gold Rush era. Id. at 139. The database contained sales from 1987 through June 10, 2016. Id. at 138.

recovered, the majority of this total value comes from the forty-five gold ingots, 1,956 San Francisco Mint gold coins, and 1,600 ounces of gold dust and mineral form gold. Id. The coins are only in marketable condition after they are curated, a process that removes foreign deposits; they are then graded according to the Sheldon Coin Grading Scale. Id.[16] Mr. Manley's valuation of the gold assumes and takes into account that the items will be professionally curated and graded prior to marketing and sale. Id.[17]

Like Mr. Alasko, Mr. Manley first personally inspected all of the gold — namely, the gold ingots, the gold dust and mineral form gold, and the gold, silver, and copper coins — at the storage facility. Id. at 2. He then determined the probable grade to be assigned to each coin, using the Sheldon Coin Grading Scale;[18] and from the type and grade of coin, he then used market research, including past sales information, to

---

[16] The Sheldon Coin Grading Scale is a seventy-point scale used to assess the numismatic quality of a coin. RLP Evid. Hr'g Ex. 44 at 10. It is "used by virtually all coin grading companies and is the essential reference system used in the valuation of numismatics." Id.

[17] Accordingly, the valuation does not include a separate item for the cost of performing the necessary curation. See RLP Evid. Hr'g Ex. 44 at 20.

[18] See supra note 16. Although the coins are currently un-curated, for the purposes of the valuation, Mr. Manley determined the most likely grade of each coin after its future curation. RLP Evid. Hr'g Ex. 44 at 3, 10.

arrive at a fair market value for the coin. Id. at 3, 10-11. He also considered recent sales and current sales offerings of historic gold ingots and coins comparable to the coins evaluated, together with his experience in curating, marketing, and selling the treasure recovered from the Central America in the 1988-1991 salvage efforts. Id. at 3-4.[19]

Specifically, the gold ingots were valued based on their rarity, size, fineness (that is, purity of gold content), and condition. Id. at 7. Based on these characteristics, the ingots were also compared to sales of ingots previously recovered from the Central America and other sales of historic ingots. Id. at 3, 7. The ingots were also valued with reference to "the average spot price of gold during the course of [Mr. Manley's] research" from January 2016, to May 2016, which was "approximately $1,250 per ounce"; then that average "spot" price of gold was adjusted by a multiple of between two and seventeen, depending on the ingot, to account for the rarity of California Gold Rush ingots. Id. at 8. The gold dust and mineral form gold were also valued based on the "spot" price of gold. Id. at 10. The value was adjusted upward to account for the marketing of

_____

[19] Mr. Manley was involved in the inspection, purchase, marketing, and sale of more than ninety-five percent (95%) of the ingots and coins recovered from these earlier efforts. RLP Evid. Hr'g Ex. 44 at 1.

small quantities of this material as souvenir-sized units of approximately half a gram. Id.

As noted above, the court must make a "rough approximation" of the value of the salvaged property. Rand, 16 F.2d at 759-60. In assessing the reliability of the appraisals, the court notes the significant experience of Mr. Alasko and Mr. Manley. Mr. Alasko is an Accredited Senior Appraiser of the American Society of Appraisers with approximately forty-four years of experience as a practicing appraiser. RLP Evid. Hr'g Ex. 34 at 1. He has testified as an expert witness, or provided litigation support, in cases dating back to 1982, including cases in which he was appointed by the court. Id. at 7-10. Likewise, Mr. Manley has been professionally involved in numismatics since 1984, and a member of the Professional Numismatic Guild for over twenty-five years. RLP Evid. Hr'g Ex. 44 at 1. He has been involved with the treasure recovered from the Central America since 1998. Id. Further, both appraisers testified in detail at the evidentiary hearing about their processes and conclusions. The court considers their valuation methods to be sound and reliable, while recognizing the difficulty associated with valuing the recovered items and the fluctuating market not only for gold and silver, but for the artifacts.

Accordingly, the court **FINDS** $48,215,425 to be an appropriate approximation of the fair market value of all the

items — gold and artifacts — recovered during RLP's 2014 salvage operations.[20]

### 6. The Degree of Danger to the Salvaged Property

While the vessel here was not in immediate peril, as in a traditional salvage rescue situation, the Fourth Circuit has previously recognized in this case that saving property from the bottom of the ocean can be considered "the ultimate rescue from the ultimate peril." CADG IV, 56 F.3d at 573. Property "is far less certain of being recovered once it has sunk," posing a "danger to its continued existence and utility as property." Id. This court now opines that the property salved during the 2014 operations was certainly exposed to this danger, perhaps to a greater degree than the property the Fourth Circuit was describing in its 1995 opinion. It took twenty-five years from RLP's first recovery operations in 1988-1991, and significant advancements in technology, for RLP to recover the property at issue here. Thus, the salvaged items were at a significant risk of remaining valueless at the bottom of the ocean.

In the 2014 operations, RLP salvaged approximately 16,000 items from the bottom of the ocean. Mem. Supp. at 1; RLP Evid. Hr'g Ex. 12. The gold recovered has an estimated value of over $47 million, evidencing the "value that our society attributes

---

[20] This figure is also properly representative of the valuable services performed by RLP in its 2014 salvage efforts of the Central America.

to gold," assuming individuals are able "to assert a property interest in it." CADG IV, 56 F.3d at 573. Further, the cultural heritage items, themselves worth over $1 million, are of historic interest and provide a human connection to the shipwreck. Accordingly, this factor supports a liberal salvage award.

### 7. The Degree to Which the Salvors Have Worked to Protect the Historical and Archaeological Value of the Wreck and the Items Salved

Throughout its recovery operations, RLP has worked diligently to protect the historical and archaeological value of the wreck site and the items salved. The Receiver, Ira Kane,[21] testified that the archaeological sensitivity of the site was a "significant consideration" in planning and executing the recovery operations. Testimony of Mr. Kane at RLP Evid. Hr'g (July 1, 2016).

RLP's efforts to protect the historical value of the wreck began with mapping the wreck site in detail, through both multibeam sonar imagery and a high resolution photomosaic. See Second Report on Activities at S.S. Central America Shipwreck Site at 1 (RLP Evid. Hr'g Ex. 7). RLP created a detailed log of the ROV's activities on its many dives, including photo and video documentation, using a data logging system Odyssey developed. First Report on Activities at S.S. Central America

---

[21] See supra note 1.

26

Shipwreck Site at 3 (RLP Evid. Hr'g Ex. 6). As part of this effort, all items recovered have been thoroughly logged, including when and where they were found at the wreck and their physical descriptions, such as the material and size. See id. at 3-4. Further, the archaeologist on duty supervised and directed all ROV movements involving inspection, excavation, and recovery of items, or any other disturbances to the wreck site. See id. at 3. The court accepts the veracity of the testimony offered by multiple experts, and thus concludes, that the at-sea operations were performed in an archaeologically sensitive manner, adhering to industry best practices.

Further, as salvor-in-possession, RLP is charged by the court with the care and preservation of the artifacts and gold pending the outcome of this proceeding, and it has ably filled this role. After collecting items from the wreck, RLP and Odyssey personnel worked to stabilize and preserve their condition. As discussed above in Part III.A.2, the Odyssey Explorer is equipped with on-board facilities, the Coin Room and the ARC Van, where the archaeologists and conservator performed further documentation of the items and, importantly, "first-aid" conservation and storage to preserve the items until they were taken ashore. First Report on Activities at S.S. Central America Shipwreck Site at 3-4 (RLP Evid. Hr'g Ex. 6). Once ashore, the items were preserved by NCS and specialized conservators. See,

27

e.g., Order of October 23, 2014, ECF No. 171 (authorizing the conservation of paper artifacts by the New England Document Conservation Center, at the direction of NCS).

Because RLP requests an in specie award, granting it title to the salvaged items, it is no surprise that RLP has devoted significant resources to the preservation of the artifacts and gold. The same can be said for the detailed data compiled by the crew, as this verification of provenance will increase the market price for the artifacts and gold. Nonetheless, the motive for protecting the historical and archaeological value of the wreck and the recovered items is not at issue, only the extent to which RLP has done so. RLP has worked to preserve the historical record of its operations and the physical integrity of the wreck site itself and the items recovered, thus preserving the historical and archaeological value of both. The court finds that RLP's data collection, preservation, and conservation efforts with regards to the wreck of the S.S. Central America, and the items salved, weigh strongly in RLP's favor in determining the salvage award.

## B. Amount of Award

A salvor seeking a salvage award must "act in entire good faith and with honesty of purpose" and come to court with clean hands. CADG IV, 56 F.3d at 569 (citation omitted). Here, no potential reductions to the salvage award based on bad faith

have been suggested, and the court finds none.[22] Accordingly, after weighing the Blackwall/Columbus-America factors as discussed above in Part III.A, the courts **FINDS** that RLP is entitled to a salvage award of **ONE HUNDRED PERCENT (100%)** of the fair market value of the items recovered in the 2014 operations.

## C. Prejudgment Interest

RLP also requests prejudgment interest on its salvage expenses. Mem. Supp. at 4. The court acknowledges that awarding prejudgment interest is the general rule in admiralty, but finds that the "peculiar circumstances" present here call for deviation from that rule. See Orduna S.A., 913 F.2d at 1157. RLP recognizes that it cannot receive an award greater than the fair market value of the salvaged property, and concedes that interest will not be awarded, if it is granted a salvage award of one hundred percent (100%) of the value of the recovered property. See Suppl. Mem. Supp. at 19. Because RLP is granted a salvage award of the full market value of the salvaged items, expressed as a percentage of the market value rather than a

---

[22] The preservation and conservation of the artifacts to maximize the salvage award, if granted in the future, is not "bad faith" or a reflection on "honesty of purpose." See supra Part III.A.7. There is no guarantee of a future salvage award, and RLP, after an initial "bump" with the court, see Mem. Op. & Order of July 9, 2014, at 6-7, 21-25, ECF No. 92, did not try to bypass the court's authority to judicially approve and legally control the 2014 at-sea salvage operations, or to grant this salvage award thereafter. The bottom line is that ultimately RLP "followed the rules."

specific dollar amount, the request for prejudgment interest is **DENIED**. The liberal salvage award granted in this case is sufficient to compensate the salvors, including for any temporary loss of the use of funds employed to finance the salvage efforts.

### D. Payment of Award

RLP requests an in specie award. Mot. at 1. The court can grant such an award, if it finds that "the proceeds of any sale would clearly be inadequate to pay the salvor its full reward," R.M.S. Titanic, Inc., 286 F.3d at 204, or the salvaged items are "uniquely and intrinsically valuable beyond their monetary worth." Cobb Coin Co., 525 F. Supp. at 198.

Here, a judicial sale would be inadequate to fully reward RLP for its salvage efforts. The appraised fair market values accepted by this court assumed these rare items would be marketed to appropriate buyers, through experienced auction houses and numismatic dealers, and that the historic provenance of the items would be promoted. See supra Part III.A.5; RLP Evid. Hr'g Ex. 35 at 11, 138; RLP Evid. Hr'g Ex. 44 at 3, 20. The separate categories of artifacts and gold appeal to different audiences that do not necessarily overlap, and the court agrees that the items need to be marketed individually. See, e.g., Suppl. Mem. Supp. at 16. For example, the gold dust can be packaged and sold as a novelty item for a broader

audience, while the gold ingots are marketed to collectors willing to pay hundreds of thousands of dollars. See RLP Evid. Hr'g Ex. 44 at 4, 8-10. Further, the coins need to be curated, graded, and marketed, and this process could take eighteen to thirty-six months to complete. Id. at 20. The United States Marshal is simply not properly equipped with the necessary resources and expertise to perform these pre-sale processes, given the above considerations.[23] In contrast, RLP and its team of experts are experienced with the conservation and marketing efforts required, and understand the appropriate sales channels for the artifacts and gold.[24] Moreover, given the additional curation, grading, and marketing necessary to obtain the fair market value of the salvaged items, the court **FINDS** that a judicial sale would be inadequate to pay RLP its full salvage award.

Accordingly, the court **GRANTS** RLP title to the items salvaged in the 2014 recovery operations, as listed in the inventories filed with the court. See RLP Evid. Hr'g Ex. 12.

---

[23] Under the Federal Rules of Civil Procedure, Supplemental Rules for Admiralty and Maritime Claims Rule E(9)(B), sales of property are to be made by the marshal or a deputy marshal.

[24] In determining the liberal salvage award granted here, the court considers the additional direct expenses RLP will incur to perform this work.

## IV. CONCLUSION

For the reasons set forth in this Opinion, the court hereby **GRANTS** RLP a salvage award in the amount of **ONE HUNDRED PERCENT (100%)** of the fair market value of the items recovered in the 2014 recovery operations. The court **DENIES** prejudgment interest. Further, the court **FINDS** that "the proceeds of any [judicial] sale would clearly be inadequate to pay the salvor its full reward" in this case. R.M.S. Titanic, Inc., 286 F.3d at 204. The court further **FINDS** that the amount of RLP's salvage award can only be satisfied by the court conveying title to the artifacts. Accordingly, the court **GRANTS** RLP title to the artifacts recovered in the 2014 salvage operations.

The Clerk is **DIRECTED** to send a copy of this Opinion to counsel for the Plaintiff.

**IT IS SO ORDERED.**[25]

/s/
Rebecca Beach Smith
Chief Judge

REBECCA BEACH SMITH
CHIEF JUDGE

August 31, 2016

---

[25] An Index of this Opinion is attached for reference purposes and made a part hereof.

INDEX

I.    Procedural History ........................................ 1

II.   Admiralty Law of Salvage ................................. 6

      A.   Determination of Salvage Award ..................... 6

      B.   Grant of Award in Specie .......................... 8

      C.   Prejudgment Interest .............................. 9

III.  Analysis ................................................ 10

      A.   Factors in Salvage Award Calculation ............. 10

           1.   Labor Expended by the Salvors.................. 11

           2.   The Promptitude, Skill, and Energy Displayed in
                Rendering the Service and Saving the Property..... 13

           3.   The Value of the Property Employed by the
                Salvors, and the Danger to Which Such Property Was
                Exposed........................................ 17

           4.   The Risk Incurred by the Salvors in Securing the
                Property from the Impending Peril................ 18

           5.   The Value of the Property Saved.................. 20

           6.   The Degree of Danger to the Salvaged Property..... 25

           7.   The Degree to Which the Salvors Have Worked to
                Protect the Historical and Archaeological Value of
                the Wreck and the Items Salved................... 26

      B.   Amount of Award .................................. 28

      C.   Prejudgment Interest ............................. 29

      D.   Payment of Award ................................. 30

IV.   Conclusion .............................................. 32